# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

DARRYL ALLEN FLYNN,

                           Plaintiff,

v.

MATTHEW BURNS,

                           Defendant.

Case No. 17-CV-312-JPS

**ORDER**

      Plaintiff Darryl Allen Flynn ("Flynn"), a prisoner, brings this action pursuant to 42 U.S.C. § 1983 against Defendant Matthew Burns ("Burns"), a correctional officer at Waupun Correctional Institution ("Waupun"), arising from an allegedly unlawful no-contact order that prevented Flynn from having any contact with his daughter for a year. Burns filed a motion for summary judgment on October 2, 2017. (Docket #26). The motion is fully briefed and, for the reasons stated below, it will be granted.[1]

## 1.      STANDARD OF REVIEW

      Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[1]On November 28, along with his response to Burns' motion, Flynn filed his own request for summary judgment. (Docket #38). The motion came nearly two months after the Court's deadline for dispositive motions, (Docket #13 at 2), and Flynn did not explain why he could not have filed the motion timely, *see* Fed. R. Civ. P. 6(b)(1). It will be denied as tardy.

242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the court that [his] case is convincing, [he] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

## 2. RELEVANT FACTS

### 2.1 The Parties

Flynn has been incarcerated at Waupun since 2014, and was previously housed there from 2005 to 2010. Burns is employed as a correctional officer at Waupun and holds the rank of lieutenant. He has held this position since April 2016.

### 2.2 Flynn's Contact With His Daughter and Her Mother

Natasha Williams ("Williams") is the mother of S.W., one of Flynn's daughters.[2] On March 23, 2016, Flynn spoke with Williams about his desire

---

[2] Burns uses the term "legal guardian" throughout his submissions to refer to Williams, but neither party has presented evidence demonstrating whether she has sole legal custody of S.W. or whether Flynn's parental rights have been terminated under Wisconsin law. *See* Wis. Stat. § 48.01 *et seq.* As will become clear later on, answers to these questions would have had a substantial impact on the disposition of the case. For present purposes, the Court assumes that the parents share legal custody of their daughter. This appears to be an unstated premise in

to have routine contact with S.W. During this phone call, Williams indicated that she had no problem with Flynn contacting S.W. without going through her. She said that she felt S.W. was mature enough to decide whether she wanted to communicate with her father. After Flynn asked Williams for a picture of S.W., she replied: "Darryl listen, S.W. is 15 years old, if you want to write S.W. or talk to S.W., S.W. is old enough, she is in high school, she is old enough to be able to do all of that that you want her to do, she is not a little kid no more." *See* (Docket #45 ¶ 5); (Docket #48).[3] Williams also stated: "And Darryl I ain't mad at you or nothing, I'm just saying that you all can have a conversation, you know, you all don't have to use me as a three-way." (Docket #45 ¶ 6). At the time of this conversation, Flynn knew that S.W. lived sometimes at her mother's house and sometimes at her great-aunt's house.

---

Flynn's submissions. *See* (Docket #41 at 5) (referring to Williams as the custodial and himself as the non-custodial parent).

[3]Docket entry 48 is a placeholder for a compact disc containing audio recordings of the phone calls at issue in this case. Both the Court and Burns' counsel reviewed the disc and listened to the recordings on it. The parties dispute the contents of the calls, but the Court's narrative reflects the relevant contents of the calls accurately. While testimony about the contents of the calls might have been rejected as hearsay, recordings of the calls can be used to prove their contents, particularly as Burns does not challenge the authenticity of the recordings.

However, for the March 23, 2016 call, the Court relies upon Flynn's account of its contents. He appears to have provided some other, irrelevant call on the disc in place of the March 23 call. The Court listened to all four audio files on the disc, and while it was able to discern which files corresponded with the March 26, April 2, and April 17 calls, the remaining file does not contain any of the statements Flynn claims it does. Indeed, that final recording cannot be from March 23, 2016, as it references the no-contact order that was not issued until May of that year. Further, Flynn's recent declaration regarding the recordings did not clarify matters. *See* (Docket #52). However, because it does not change the outcome, the Court will take as true Flynn's representation about the contents of the March 23 call.

On March 26, 2016, during a phone conversation between Flynn and his daughter, S.W. informed Flynn that she had written him two letters. He replied that he had never received them. During this same conversation, S.W. stated that she had not been receiving Flynn's mail, either. Flynn suspected that Williams had been intercepting mail to and from S.W., although S.W. did not actually say that this was occurring during the March 26 call. Additionally, during the call S.W. opined that Flynn's recurring phone calls to her had not been received because her mother's then-boyfriend had blocked the calls out of jealousy.

Knowing that S.W. was splitting her time between her mother's house and her great-aunt's house, that her mother's boyfriend was interfering with their contact by blocking his phone calls, and that Williams was intercepting their mail, Flynn decided to send letters to S.W.'s school to ensure that she received them. He wrote to the principal of the school and sought approval, explaining why he wanted to write S.W. at school and telling the principal that he would take a week's silence in response as a sign of approval to begin writing. After a week with no response, Flynn sent S.W. a greeting card to see if the school would in fact give it to her. It did.

After the greeting card, Flynn sent a letter and some self-addressed stamped envelopes to S.W.'s school. He wrote only her name on the envelopes, with the idea that whatever return address she placed on the envelope would be the address that he would write her at from then on. S.W. wrote back using the school's address as her return address. In the letter, she expressed admiration for Flynn and frustration at her mother, alleging that she was being mistreated at home.

Flynn avers that "[a]s a father, I felt obligated to make my daughter feel loved and special. I knew that the only way to accomplish this goal was

to build and maintain a relationship with her despite her mother's attempts at parental alienation." *Id.* ¶ 14. Additionally, he felt no qualms writing to S.W. at school, since it was necessary to circumvent Williams' interception efforts and Williams had already given permission for such contact without her knowledge or involvement. *Id.* Flynn reports that every time S.W. wrote to him, she used her school's address as her return address. If at any time she had expressed to him that she did not want to be written at her school, Flynn avers that he would have immediately stopped. However, S.W. continued to write and express how happy she was to be corresponding with Flynn.

### 2.3    Burns' Contact With Williams and the No-Contact Order

On May 27, 2016, Williams, having learned that Flynn was writing to S.W. at school, called the institution to voice her concerns regarding Flynn contacting their daughter. Burns was the supervisor on duty that night who answered the call. Williams told Burns that Flynn was sending letters to their daughter at school in order to circumvent her from being able to read the letters.[4] Burns offered that the institution could issue a no-

---

[4]Burns claims that, based on Williams' statements, it appeared that Flynn was trying to contact his daughter at her school as a way of circumventing her mother from oversight of the correspondence. Anthony Meli ("Meli"), the Waupun security director, opines that secret communication against the wishes of the mother is considered anti-social, counter-rehabilitative behavior. (Docket #29 ¶ 18). However, Flynn correctly notes that the substance of Williams' comment—that Flynn was trying to circumvent her by writing to S.W. at school—cannot be proved by Burns' testimony about the contents of the call. That would violate the rule against hearsay. Fed. R. Evid. 802. However, Burns is likewise correct in saying that the statement can be considered for the effect it had on him as the hearer, which is a non-hearsay purpose for the evidence. *Id.* 801(c)(2); *United States v. Hanson*, 994 F.2d 403, 406 (7th Cir. 1993). In any event, although the parties strenuously disagree as to whether Williams condoned the Flynn-S.W.

contact order to prevent Flynn from contacting S.W. Williams assented and asked that the no-contact order be issued. Burns told Williams that he would issue the order that evening.

Burns avers that at this time it was his understanding that Williams was S.W.'s legal guardian. Burns did not confirm that Williams was in fact S.W.'s guardian or ask Williams to prove this in any way. He simply took her at her word. (Flynn suggests it may actually have been another individual calling, but this is pure speculation.) Additionally, Burns did not conduct any type of investigation into Williams' request prior to issuing the no-contact order. Based on his training and experience, taking such a request over the phone from the custodial parent of a minor is sufficient to warrant issuance of a no-contact order.

On May 27, Burns sent correspondence to Flynn ordering him to not communicate with Williams' daughter by any means. The no-contact order read: "On 5/27/2016, I received a complaint from Natasha Williams indicating that you have written and/or called her house or contacted her daughter at her school. This party has requested that you no longer write, call or contact them again. Therefore, I am ordering you to not communicate with this party again. Failure to comply with this order will result in disciplinary action." (Docket #30-1).

### 2.4 Flynn Challenges the No-Contact Order

Since receiving the no-contact order, Flynn has submitted nineteen interview request forms to different staff members concerning the order.[5]

_____

correspondence, the Court must resolve that dispute in Flynn's favor at this juncture.

[5]At Waupun, correspondence from a prisoner to a staff member is accomplished via an interview/information request form. It is a double-sided

Flynn wrote eight such requests to Burns between May 28, 2016 and March 3, 2017. Burns only responded to three.

On May 28, 2016, Flynn wrote Burns two interview requests. In the first, he informed Burns that S.W. was his daughter and that paternity had been established in 2002. In the second, Flynn asked Burns what evidence of wrongdoing had he required Williams to produce before issuing the order and what Department of Corrections ("DOC") policy gave him the authority to impose such a restriction. Burns never answered those questions. On May 31, the Waupun security director, Meli, wrote to Flynn and confirmed that Burns had issued the no-contact order and that all questions should be directed to him.

On June 6, Flynn wrote Burns again and explained that he had not written to Williams or sent mail to her house. He explained that he had been contacting S.W. at school and that she wanted the contact. To prove this, Flynn sent Burns five pages from two different letters written by S.W. in which she expressed her desire to communicate with Flynn.

On June 10, Burns responded to one of Flynn's May 28 interview requests, stating that he had received a complaint from Williams and that,

---

document, with one side giving lines for the prisoner to address the request to the addressee and the other side providing lines so that the prisoner can write or type his issue or question. The form is then folded and placed in the institution mailbox to be delivered to the addressee. It is usually delivered to the addressee the next day. No postage is required to send such a request.

Flynn avers that during his thirteen years of incarceration thus far, he has sent hundreds of interview requests to staff members and has never heard of one being lost or not delivered to the addressee. However, he claims there are times when the addressee ignores the request and will not respond, and then the contents of that request is lost forever. To avoid losing their contents, Flynn states that it is his practice to make an exact duplicate of every important interview request he sends to the institution staff.

as a DOC employee, he was required to issue the no-contact order. He invited Flynn to file an inmate complaint through the Inmate Complaint Review System ("ICRS"). That same day, Flynn filed such a complaint, contending that the no-contact order violated his right to communicate with his daughter. Also on June 10, Flynn filed a motion in Milwaukee County Circuit Court seeking an order that would allow him to communicate with S.W. by letter, phone, and visitation.

Later that month, Burns was contacted by the inmate complaint examiner, James Muenchow, about Flynn's complaint. Burns provided him with a copy of the no-contact order. Flynn's complaint was dismissed by Muenchow because the no-contact order was "consistent with the need to protect the public." (Docket #31-1 at 2). Muenchow further stated that

> Inmate Flynn must realize that the matter between himself and the mother of his child is something of which the ICRS will not nor cannot intercede upon, referencing any "ordered" communication or prohibition of same. That is a legal matter that cannot be determined here.

*Id*. Finally, Muenchow noted that Burns continued to investigate the matter and the no-contact order could be lifted if warranted after that investigation. *See id*. The warden affirmed Muenchow's disposition.

Flynn has several complaints about the adequacy of the grievance process. First, he notes that Muenchow told him three times that Burns was investigating the matter. As a consequence, Flynn continued to correspond with Burns about his investigatory efforts. Yet Burns now tells the Court that Muenchow was mistaken and that he did not perform any investigation at any time. Second, says Flynn, the ICE dismissed his complaint because they have "a clanked policy to affirm the decisions of security supervisors." (Docket #51 at 20).

Third, Flynn complains of additional alleged misinformation from Muenchow about the scope of ICRS review. From Muenchow's statement that ICRS would not intervene in the parent-parent dispute, Flynn thought Muenchow was stating that his department did not have the authority to review a no-contact order. However, Flynn did not want to leave this to his own surmise, so he wrote Muenchow and asked him to expound on his statement. Muenchow responded, "We will not second-guess security decision or question a judge's order." (Docket #45 at 87). This complaint was appealed to the Office of the DOC Secretary, where it was ultimately dismissed as Flynn did not provide any additional evidence to recommend overturning the institution's decision.

On July 10, Flynn wrote Burns another interview request explaining that he had just learned that S.W. was currently living with his niece. Flynn asked Burns if the no-contact restriction could be removed so that he could contact his daughter at his niece's residence. Burns never responded to this request.

On July 31, Flynn wrote Burns and alleged that it was possible that the complaining caller was not Williams but was instead the cousin of his daughter's adult boyfriend. Flynn asked Burns to contact Williams and confirm that she had actually made the call. On August 9, Burns responded, stating that "[t]he no contact was done correctly and will not be lifted." *Id.* at 32.

On October 20, Flynn appeared by telephone in Milwaukee County Circuit Court in the case of *Natasha Williams v. Darryl Flynn*, Case No. 2001PA2458, for a hearing on his June 10 motion. Williams was present and objected when Flynn asked the court to order that he be allowed to write S.W. from the prison. The court held the motion open until it could

determine what S.W. wanted. The court appointed a guardian ad litem to represent the child and continued the hearing to February 7, 2017.

On December 29, 2016, Flynn sent an open records request to Burns asking Burns to furnish him with the results of the investigation into the no-contact order. Flynn requested copies of all reports, notes, and evidence collected. He also asked Burns if there was any way to have the no-contact order removed so that he could begin writing to his daughter. Burns never responded to this request and never sent any of the materials that Flynn demanded.

### 2.5    The State Court Order and the Second Grievance

On February 7, 2017, at the continued state court hearing, there was some consensus between the parties that phone calls and letters to S.W. were acceptable as long as Flynn did not mention Williams. The court issued a written order directing that Flynn be allowed to mail S.W. one letter per month to Williams's house, and Williams could read it before giving it to S.W. if she wanted. The court also ordered Flynn be allowed at least one telephone call a month with S.W. *Id.* at 51–55.

On February 13, Flynn sent a copy of the court order to his social worker and asked her to place it in his social services file. The records office responded and explained that they would not place the order in Flynn's file because it was not generated by the DOC.

Flynn then sent Burns an interview request dated February 16, stating that he now had a court order allowing him contact with S.W. and asking that the prison's order be rescinded. Attached to that form was a copy of the state court order. Nevertheless, Burns did not respond and the no-contact order was not immediately lifted.

Burns claims that he never received a copy of the order, or that he never actually saw it even if it was attached to the February 16 correspondence. Burns says that if he had received the court order, he would have worked to lift the no-contact order at that time. Flynn counters that Burns did receive it and ignored it, based on his experience that interview requests do not get lost in transit. *See supra* note 5.

Moreover, Flynn contends that on March 3, Burns came to see him at his cell. Burns was holding the February 16 correspondence. Burns told Flynn that he had reviewed Flynn's numerous interview requests, though he did not mention the state court's order. Burns stated, "You keep writing me all these requests, and I'm not answering because nothing is going to change." *Id.* ¶ 38. Burns warned him to stop asking for the no-contact order to be lifted. Flynn believes that because Burns was holding the February 16 request, he must have read the attached court order and willfully ignored it.[6]

That same day, Flynn wrote Burns a final interview request thanking him for the visit and explaining that he would follow the order not to bother him again. However, Flynn also included in the correspondence an open records request seeking a copy of the February 16, 2017 interview request. On March 8, Burns answered that "[t]his matter is closed as I stated in our conversation." *Id.* at 38. He did not send the requested copy.

On March 5, Flynn wrote the Waupun warden about Burns' visit and asked if there was any way that Flynn could have the no-contact order

---

[6]At times, Flynn suggests that Burns might have come to see him because of the filing of this lawsuit on March 2, 2017. However, the Court did not screen the complaint and order service until March 14, 2017, (Docket #8), so Flynn's suggestion is only speculative.

removed. Flynn explained that writing is the only way by which he could communicate with his daughter. The warden never responded.

On March 14, Flynn wrote another open records request, this time to the prison investigation supervisor, asking for all correspondence between Waupun and Williams prior to the no-contact order being issued, as well as all evidence that was obtained during the investigation leading to the issuance of the no-contact order. The investigation supervisor never responded to this request.

On March 21, Flynn wrote to the investigation supervisor again and asked when he would be able to contact his daughter again. He further questioned whether the prison's no-contact order trumped the court's order. The investigation supervisor replied, "What no contact order are you referring to?" *Id.* at 61. On March 25, Flynn sent the investigation supervisor a copy of the no-contact order and a copy of the state court order. On April 3, Meli responded to this request and stated: "You can have contact with the child—If the child wants to have contact with you. It appears the child's guardian has a no contact order. You will have to contact the court." *Id.* at 63.

On June 12, Flynn filed a second ICRS complaint, complaining that Burns was refusing to remove the no-contact order after he had sent Burns a copy of the state court order. Muenchow asked Flynn to send him Meli's response to the March 25 interview request, but Flynn did not do so because, as he stated, he normally does not keep requests once he is finished reading them. *Id.* at 85.

Burns contends that the first the institution heard of the state court order was in Flynn's June 2017 inmate complaint. At that time, Burns spoke with Meli, since he had never had to modify a no-contact order before and

he wanted to ensure that he was doing things correctly in lifting the no-contact order. Based on the court's decision, Meli decided to lift the no-contact order as long as Flynn followed the guidelines set forth therein.[7]

Three days after the complaint was filed, on June 15, Burns sent Flynn a memorandum informing him that he could now contact S.W. in compliance with the court order. Burns threatened that if staff ever heard that Flynn violated the terms of the court order, a no-contact order would again be placed upon him. *Id.* at 88.[8]

Burns sent a copy of the memorandum to Muenchow. On June 16, Muenchow recommended that Flynn's second complaint be affirmed with modifications. On the same day, the reviewing authority affirmed the complaint. Flynn has been able to contact his daughter since this June 15, 2017 under the guidelines set forth in the court order.[9]

Flynn complains that the non-contact order has not been removed from his file and he worries that it might be reinstated, or that the allegations therein might be used to support a new no-contact order.

Burns points out that Flynn's approved visitor list includes family members, such as his son, sister, granddaughter, and two other daughters

---

[7]Meli suggests that the DOC retains the discretion to refuse to abide by court orders for "security and rehabilitation" reasons. (Docket #29 ¶ 30). That did not occur in Flynn's case.

[8]Flynn derides Burns' remedial actions as having been done at the advice of counsel. *See* (Docket #51 ¶ 50). His claim is of questionable relevance and is in no way supported by the record.

[9]While the no-contact order was active from May 27, 2016 through June 15, 2017, Flynn claims that he never violated it. However, the state court order reflects that Williams alleged that Flynn did try to contact S.W. through one of his other children between the first session of the hearing on October 20, 2016 and the second session on February 7, 2017.

besides the daughter at issue in this case, S.W. None of Flynn's family members on his approved visitor list have no-contact orders issued by Waupun. Flynn retorts that although he could communicate with other family members, the no-contact order meant he could not see S.W. along with their visits nor could he pass messages to her through them.

### 2.6 Waupun's No-Contact Policy

Part of the mission statement of the Wisconsin DOC is to protect the public, its staff, and those in DOC's charge. Part of protecting the public includes making sure that inmates are not involved in unwanted, unsolicited, or harassing contact with members of the public. Issuing no-contact orders is a measure taken in order to protect the public from unsolicited or harassing contact by inmates in DOC custody.

Meli, as the Waupun security director, provided a great deal of testimony about DOC and Waupun policy as it relates to no-contact orders. He avers that whenever a member of the public contacts the institution with a legitimate complaint about unwanted inmate contact, it is DOC's policy to tell the inmate, either verbally or in writing, not to contact that person. A similar order is issued when a parent or legal guardian of a minor notifies staff that they do not want a certain inmate contacting the minor. If the complainant expressly requests that a no-contact order be issued—what Meli calls a "formal complaint"—the security supervisor will speak directly to the inmate regarding the complaint and issue him a memorandum directing him not to make contact with the person listed by any means whatsoever, be it mail, phone, through visitation, or via a third party.

Meli avers that it does not matter if the complaint was made over the phone or in writing. Flynn disputes this and points out that the prison handbook allows no-contact orders to be issued only upon written request.

Nevertheless, Meli maintains that DOC has an additional, unwritten policy of accepting written or oral complaints as a basis for a no-contact order. Despite the language of the prison handbook, Burns maintains that it was this unwritten policy he was trained to enforce.

All security supervisors, including Burns, are trained through on-the-job training in issuing no-contact orders shortly after becoming a supervisor at Waupun. The supervisor is trained that he or she must speak with the complainant directly, provided the complainant is over eighteen years of age. If the complainant is a minor, the supervisor must speak with the minor's guardian. The supervisor gathers information regarding the complainant's name, address, telephone number, date(s) of contact/correspondence received, and identification of the inmate or suspected inmate.[10]

An inmate's failure to follow a no-contact order resulting from a formal complaint will result in disciplinary action. If the complainant does not want to make a formal complaint, the supervisor will speak with the inmate and verbally direct them not to contact the person. If it is not based on a formal complaint, inmates are not subject to disciplinary action for violating a no-contact order. There is usually no end date to a no-contact order, unless the party requesting the no-contact order decides to end it.

Burns did not create the no-contact policy. Security supervisors at Waupun have no discretion with respect to the process regarding issuing no-contact orders. They are trained to follow it, and have no authority to circumvent it.

_____

[10]As discussed above, Flynn disputes whether Burns actually gathered all the required information in his case, but that does not undermine the general purview of the supervisor's investigation.

### 2.7 Goals of the No-Contact Policy

According to Meli, Waupun's no-contact policy serves several important, related objectives. First, the primary goal of a no-contact order is to protect the public from harassment by inmates. Telephone calls and letters, regardless of content, can be harassing if the complainant does not want an inmate contacting him or her.

Second, although the institution encourages communications between an inmate and his family and friends, unwanted contact with these individuals can be counterproductive to the inmate's rehabilitation, as it may reinforce negative or potentially criminal behavior. In some cases, the person receiving the unwanted contact is the victim of the inmate's crime or a family member of the victim. In such instances, it is important to prevent contact so that the person is not subject to re-victimization by the inmate. That said, being a victim of the inmate's crime or family member of the victim is not a prerequisite to obtaining a no-contact order. Because there are many circumstances which can warrant a no-contact order, DOC tries to respect the wishes of those individuals who choose to not be contacted by the inmate.

Third, a no-contact order furthers administrative concerns of the prison. For instance, if an inmate was allowed to contact someone who had complained about receiving unwanted correspondence, prison staff might have to screen each piece of mail and each telephone call to make sure that the inmate's statements were appropriate, which would place an unreasonable burden on administrative staff. Flynn says that the alleged burden is overblown because the complainant herself can alert the prison to unwanted correspondence, but Meli avers that DOC nevertheless feels responsible for screening mail leaving its facilities in the first instance. He

contends that this is the only way to prevent the harm that stems from the inappropriate letter being received by the complainant. Moreover, the prison may have to field numerous complaints from individual members of the public if an inmate was not prevented from contacting people who did not wish to be contacted.

The blanket-ban nature of a no-contact order also serves a penological objective. Meli avers that inmates frequently give or trade contact information between each other, in order to harass or intimidate the public. Without enforcing a no-contact order, they could share that information and have third-party contacts. Issuing a blanket ban to an inmate telling him not to contact a certain person by any means helps avoid this problem. Flynn protests the suggestion that he shared his daughter's information, and Burns concedes that this is simply a general justification for the prison policy and that no allegation of such conduct has been made against Flynn personally.

### 2.8    Enforcing and Challenging a No-Contact Order

Enforcement of no-contact orders relies primarily on the complainant, who is generally instructed to contact the institution if they receive future contacts. If notified by the complainant, the prison can verify future contacts by checking the inmate phone system. If the complainant receives correspondence, he or she is instructed to keep any letters that arrive and forward them to the prison, typically to the security director, for review. Once the security director receives verification that an inmate has violated his no-contact order, a conduct report is issued.

There are approximately 165 no-contact orders presently in place at Waupun that have been issued since 2014. Thirty-nine of them were issued

in 2016, including Flynn's. In 2017, as of the submission of Burns' summary judgment motion, there have been sixteen issued.

There is no formal hearing provided prior to the issuance of a no-contact order. Staff are trained to issue the inmate a no-contact order upon receiving a complaint by a member of the public. If any inmate wants to challenge the order, he is permitted to file an inmate complaint under the ICRS. Meli avers that staff do not have the time, resources, or training to adjudicate at the outset the merits of the various issues that may have caused a person to request a no-contact order. For the most part, they must assume the request is warranted.

Flynn strenuously disagrees with the wisdom of this policy, arguing that cutting off all communication between the inmate and another person—in this case, a father and daughter—should result from some meaningful investigation. At a minimum, he should have been apprised that he could seek relief from a no-contact order in state court, as Flynn eventually did over a year after the issuance of Burns' order. Similarly, Flynn complains that the no-contact order itself did not tell him that he could file a grievance challenging it. Indeed, says Flynn, even when he actually filed such a grievance, Muenchow told him repeatedly that the ICRS was the wrong avenue for relief.

Meli replies in two ways. First, Flynn was permitted to and did file an inmate complaint after learning of the no-contact order. Second, although Muenchow said he would not get in the middle of the dispute between Flynn and Williams, he nevertheless investigated the matter by contacting Burns, reviewing the policy, and finding the order was consistent with the need to protect the public. Flynn received a decision by

the warden dismissing the complaint, he appealed the dismissal, and he received a decision on the merits of his appeal by the Secretary's office.

## 3. ANALYSIS

In this suit, Flynn claims that the no-contact order should never have been put in place and that, in any event, he should have been told that he had to seek a court order to undo it. Because he did not know that this was his recourse, he missed out on a year of communication with his daughter. Moreover, says Flynn, Burns ignored the state court's February 2017 order for a substantial period of time, failing to act on it until June 2017.

Although the facts of this case are simple, its resolution turns on the law's uncertainty concerning Flynn's asserted rights. The thrust of the complaint is that Burns' actions and the no-contact policy itself violated his First Amendment right of association and his Fourteenth Amendment procedural and substantive due-process rights. These are thorny issues not susceptible of easy resolution. For that reason, the Court must save them for another day, since qualified immunity supplies an independent basis for dismissal of Flynn's damages claims. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Court will first review the principles of qualified immunity, then the substantive law applicable to Flynn's claims. Next, the Court will explain how the substantive law in this arena did not make plain any potential constitutional problem so as to overcome Burns' assertion of immunity. Finally, the Court will dismiss Flynn's remaining claims for declaratory and injunctive relief, as they are moot.

### 3.1 Qualified Immunity

Qualified immunity protects government officials from suits for damages when their actions do not violate clearly established constitutional

or statutory rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Once a defendant asserts a qualified immunity defense, the plaintiff has the burden to establish that the defendant's action violated a clearly established right. *Estate of Escobedo v. Bender*, 600 F.3d 770, 779 (7th Cir. 2010). "To be clearly established, a right must be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (alteration in original) (citation omitted). "This is a high bar." *Kramer v. Pollard*, 497 F. App'x 639, 642 (7th Cir. 2012).

The Supreme Court has emphasized that "the clearly established law must be 'particularized' to the facts of the case. . . . Otherwise, plaintiffs would be able to convert the rule of qualified immunity. . .into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *White v. Pauly*, 137 S. Ct. 548, 551 (2017). To defeat a qualified immunity defense, a plaintiff need not point to a case that is factually identical to the present suit, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "In other words, immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *White*, 137 S. Ct. at 551 (*quoting Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). Qualified immunity serves to shield officials from suit in cases involving "gray areas" of constitutional rights. *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992); *Anderson v. Creighton*, 483 U.S. 635, 639–40 (1987) (a rejection of qualified immunity requires "that in the light of pre-existing law the unlawfulness [of a defendant's actions] must be apparent").

### 3.2   Substantive Law Applicable to Flynn's Claims

Flynn alleges that Burns' issuing the no-contact order violated his First and Fourteenth Amendment rights. "[T]he Constitution protects

'certain kinds of highly personal relationships.'" *Overton v. Bazetta*, 539 U.S. 126, 131 (2003). This includes the right to associate with close family members. *Id.* Courts have found that "[p]arents have a liberty interest, protected by the Constitution, in having a reasonable opportunity to develop close relations with their children." *See Hodgson v. Minnesota*, 497 U.S. 417, 484 (1990) (Scalia, J., concurring in part and dissenting in part). Additionally, it is well-settled that prison inmates have a First Amendment right both to send and receive mail. *Kaufman v. McCaughtry*, 419 F.3d 678, 685 (7th Cir. 2005).

However, "[t]he very object of imprisonment is confinement." *Overton*, 539 U.S. at 131. "Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner. An inmate does not retain rights inconsistent with proper incarceration." *Id.* For instance, the freedom of association, though crucial in the scheme of the Bill of Rights, is nevertheless "among the rights least compatible with incarceration." *Id.* As a result, "[s]ome curtailment of that freedom must be expected in the prison context." *Id.*

Prison officials may impose reasonable restrictions upon a prisoner's constitutional rights. *Easterling v. Thurmer*, No. 17-1581, 2018 WL 298114, at *2 (7th Cir. Jan. 5, 2018); *Harris v. Donahue*, 175 F. App'x 746, 747 (7th Cir. 2006). Burns proposes two potential standards for evaluating the no-contact policy in this case. The first is the deferential standard articulated in *Turner v. Safley*, 482 U.S. 78, 89–91 (1987), which provides that a prison policy will be upheld if it is reasonably related to legitimate penological interests. There are four factors that courts must consider under *Turner*: (1) whether a rational connection exists between the prison policy regulation and a legitimate governmental interest advanced as its justification; (2) whether

alternative means of exercising the right are available notwithstanding the policy or regulation; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether ready, easy-to-implement alternatives exist that would accommodate the prisoner's rights. *Id.*; *Harris*, 175 F. App'x at 748. "The four factors are all important, but the first one can act as a threshold factor regardless which way it cuts." *Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010); *Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009) ("Where. . .there is only minimal evidence suggesting that a prison's regulation is irrational, running through each factor at length is unnecessary."). Those who challenge the reasonableness of a prison regulation bear the burden of proving its invalidity. *Overton*, 539 U.S. at 132; *Jackson v. Frank*, 509 F.3d 389, 391 (7th Cir. 2007).

But the Supreme Court has applied a different, higher bar to restrictions on outgoing prison mail, which was one component of the no-contact order in this case. In *Procunier v. Martinez*, 416 U.S. 396, 414 (1974), the Court held that restrictions on outgoing mail must be "generally necessary" to protect a legitimate government interest. Such restrictions must meet two criteria:

> First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a

restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad.

*Id.* at 413–14. In *Martinez* itself, the Court invalidated state prison regulations authorizing censorship of mail containing defamatory, inflammatory, or inappropriate statements. *Id.* at 415. The Court concluded that the prison authorities had "failed to show that these broad restrictions on prisoner mail were in any way necessary to the furtherance of a governmental interest unrelated to the suppression of expression." *Id.*

The *Martinez* standard was later expressly confined to the context of outgoing prison mail, as restrictions on outgoing mail pose less weighty institutional concerns than those affecting incoming materials. *See Thornburgh v. Abbott*, 490 U.S. 401, 411–14 (1989). The *Thornburgh* Court further clarified that while *Martinez* speaks of general necessity and requires a "close fit between the challenged regulation and the interest it purport[s] to serve," it does not impose a least-restrictive-means requirement on prisons. *Id.* at 410–11.

Whether applying *Turner* or *Martinez*, a district court may not substitute its own judgment for that of prison officials when reviewing the validity of prison regulations. *Id.* at 407–08; *Turner*, 482 U.S. at 89. Deference to prison officials is appropriate because the judiciary does not possess the necessary expertise and resources to deal with the "difficult and delicate problems of prison management." *Thornburgh*, 490 U.S. at 407. When, as in this case, a state penal system is involved, the federal courts have even greater reason to accord deference to prison authorities. *Turner*, 482 U.S. at 85; *Martinez*, 416 U.S. at 405.

### 3.3 Burns' Conduct Did Not Violate Flynn's Clearly Established Constitutional Rights

Equipped with an understanding of the high burden Flynn faces to overcome Burns' assertion of qualified immunity, along with the nuanced and interrelated constitutional standards implicated in the no-contact order, it becomes plain that Burns is entitled to immunity in this case. Though the parties do little to characterize the relevant rights—an important initial step in the qualified immunity analysis—the Court construes them as follows, taking into account the generous standard of review Flynn enjoys at this juncture as well as the Supreme Court's admonition that rights be defined at a high level of specificity:

> (1)　Whether it was clearly established that an inmate has a right to communicate with his minor child despite a request by the other parent to stop such contact; and

> (2)　Whether it was clearly established that an inmate has a right to a pre-deprivation hearing or notification about potential remedies before a no-contact order involving his minor child is issued.

Whether these are the most precise statements of the rights at issue is of little moment, as nothing in the case law comes close to establishing that these rights existed at the time Burns acted.

A brief examination of the no-contact policy and Burns' conduct as against the substantive legal standards will set the stage for the qualified immunity analysis. Under either *Turner* or *Martinez*, the prison must point to one or more legitimate interests the policy serves, such as "security, order, and rehabilitation." *Martinez*, 416 U.S. at 413; *Turner*, 482 U.S. at 89–91. Meli has averred that the no-contact policy furthers the prison's interest in protecting the public, rehabilitation of the inmate, and administrative concerns, and Flynn does not meaningfully dispute these broad objectives.

Thus, it would appear that the no-contact policy is not invalid based on the interests it purports to serve. *See Lagar v. Tegels*, No. 14-CV-036-WMC, 2016 WL 6990011, at *10 (W.D. Wis. Nov. 29, 2016).

A far closer question arises regarding the fit of the policy to Flynn's circumstances. To be sure, many cases support the notion that a prison can restrict communication between a prisoner and others, whether in person or in writing. Many others uphold a prison's right to censor outgoing mail when it is being sent to people who do not wish to receive it. *See Berdella v. Delo*, 972 F.2d 204, 209 (8th Cir. 1992); *Jones v. Diamond*, 594 F.2d 997, 1014 (5th Cir. 1979). Such regulations appear justifiable as being generally—though perhaps not absolutely—necessary to further the government's interests in protecting the public and rehabilitating the inmate. Flynn says that other policies might be better tailored to the prison's needs, but not even *Martinez* asks institutions to fashion regulations that have a close fit to their ends. That was the point of *Thornburgh*. *Thornburgh*, 490 U.S. at 410–11.

Flynn's real point is that this policy is unreasonably broad inasmuch as it deprived him of over a year of contact with his child. The recurring refrain in Flynn's submissions is that his case ought to have been treated differently because it pertained to communication between a father and daughter, not a prisoner and a stranger. (Docket #41 at 4). Flynn asks the Court to more deeply scrutinize the institution's actions because they affected what he views as his fundamental right to develop a familial relationship. *Id.* at 13.

The Court appreciates that the challenged regulation touched upon what is viewed outside the prison context as a core individual right.[11] But it must be remembered that *Turner* was a case about institutional regulation of the fundamental right to marry. *Turner*, 482 U.S. at 94. The Court concluded that the regulation in that case failed its test, but did not suggest that the test should be something different when a fundamental right is at stake. *See id.* at 97–99. Post-*Overton* courts have not drawn this distinction. *See Thornburgh*, 490 U.S. at 410 & n.9; *Easterling*, 2018 WL 298114, at *2; *Harris*, 175 F. App'x at 748. Indeed, the Supreme Court has made it crystal clear that constitutional rights enjoyed by prisoners are severely limited and prison restrictions are subject to only modest review. *Overton*, 539 U.S. at 131. If the Court engaged in strict scrutiny of the no-contact policy within the framework of substantive due process, *see Heck*, 327 F.3d at 518, it would eviscerate *Overton*'s policy of deference.

Thus, the result in this case does not change even if the Court credits Flynn's assertions—which do have some persuasive force—that the ability to talk to other family members is no substitute for his ability to talk to S.W., that a blanket ban on all contact overreaches the prison's justifications, and that the review process contemplated in the no-contact policy, both before and after such an order is issued, could be much more rigorous (and laid

---

[11]Such a right appears not to have been implicated in *Overton* itself, because the visitation restriction in that case did not affect children for whom the prisoner's parental rights had not been terminated. *Overton*, 539 U.S. at 133. Here, however, neither Flynn nor Burns make any conclusive indication whether Flynn's rights as a parent of S.W. have been terminated. As the Court hinted above, the resolution of this case might have been far simpler if the parties proffered evidence establishing this one way or the other. If his rights had been terminated, without doubt the no-contact order would be upheld. Because the Court must assume that Flynn retains parental rights over S.W., the question becomes much closer.

out in writing). These considerations leave the result of the *Turner* or *Martinez* analyses hazy, for while the justifications for the policy in general are strong, there remains a total lack of alternative means for Flynn to exercise his rights and an open question whether a more tailored policy would work better for parent-child communication issues.

Burns largely ignores this question, asserting only that Williams "surely" was permitted to forbid contact between S.W. and her father. (Docket #27 at 12). The Court is not at all so certain. Prison officials may be wise to rethink this policy when two warring parents are involved. Further, while some cases involve visitation bans and others restrictions on mail, no case this Court could locate involved a complete ban on all contact of any kind. In short, Waupun's regulation has raised a judicial eyebrow.

These potential shortcomings might bring the policy, at least as applied to Flynn, close to the constitutional brink, but the lack of clarity in the law means that Burns cannot be responsible for money damages on that account.[12] Starting with *Overton* itself, the Supreme Court stated that a

---

[12]Flynn offers little argument on the qualified immunity question. He contends that Burns is not entitled to qualified immunity because he was performing merely the ministerial function of enforcing the prison's no-contact policy. This argument is unpersuasive. It may be that the policy as Burns has construed it left him little discretion to deny a request for a no-contact order. But he was obligated to make an investigation and come to a determination as to the propriety of such an order, even if in practice they were usually granted without question. *See Davis v. Scherer*, 468 U.S. 183, 196 n.14 (1984) (finding that a law must "specify the precise action that the official must take in each instance" to qualify as ministerial). And the Eighth Circuit has observed, citing precedent from this and other Circuits, that the ministerial-duty exception to qualified immunity is essentially a dead letter. *Sellers By and Through Sellers v. Baer*, 28 F.3d 895, 902 (8th Cir. 1994). The Seventh Circuit has said little about it in many years, other than a few off-hand mentions. *See, e.g., Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 352 (7th Cir. 2005) ("Government officials performing discretionary functions are entitled to qualified immunity from suit 'as long as their actions could reasonably have

permanent or excessively long deprivation of all visitation privileges, or a restriction that was "applied in an arbitrary manner to a particular inmate," *may* violate an inmate's constitutional rights. *Overton*, 539 U.S. at 137. Justice Kennedy acknowledged that "*outside the prison context*, there is some discussion in our cases of a right to maintain certain familial relationships, including association among members of an immediate family and association between grandchildren and grandparents." *Id.* at 131 (emphasis added). He and the majority nevertheless declined to "attempt to explore or define the asserted right of association at any length or determine the extent to which it survives incarceration." *Id.* at 132. So the Supreme Court's pronouncements aid Flynn little.

Circuit courts have recognized the analytical lacunae left in the wake of *Overton*. In *Wirsching v. Colorado*, 360 F.3d 1191, 1198 (10th Cir. 2004), the Tenth Circuit addressed the friction between a parent's right to communicate with his child and the wide discretion afforded to prison administrators. The Court of Appeals, appreciating the importance of the right at stake, nevertheless felt constrained by *Overton* to apply the deferential *Turner* test. *Id.* Indeed, the Tenth Circuit did so even though it noted that the case before it involved visitation with an inmate's own children, whereas *Overton* only dealt with minors who were not (or who were no longer) the inmates' children. *Id.* at 1199. *Wirsching* held that the inmate in question, who was a sex offender, could rationally be precluded from all contact with his children if he refused to undergo sex offender treatment, even though it encouraged prison officials to "seriously consider

---

been thought consistent with the rights they are alleged to have violated.'") (quoting *Anderson*, 483 U.S. at 638).

less draconian restrictions" in view of the crucial parental rights impinged upon. *See id.* at 1200.

In *Dunn*, the Ninth Circuit affirmed a grant of qualified immunity to prison officials who banned a prisoner from all visitation by minors, including his own children, for a period of eighteen months. The *Dunn* court observed that the Supreme Court's "hesitation in articulating the existence and nature of an inmate's right to receive visits from family members while in prison is instructive" on the question of whether and to what extent a right to familial visitation exists. *Dunn v. Castro*, 621 F.3d 1196, 1202 (9th Cir. 2010). The court found that while incarceration does not "entirely extinguis[h]" the right to receive visits from family members, reasonable restrictions as evaluated under *Turner* are permissible. *Id.* at 1205. In such cases, the question of how far the restrictions may go "'is by no means open and shut.'" *Id.* (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

The Fourth Circuit came to the same conclusion in *Williams v. Ozmint*, 716 F.3d 801, 807 (4th Cir. 2013), in a prisoner's challenge to a two-year suspension of visitation privileges without a prior hearing. The appellate court noted that a two-year ban on visitation was analogous to the restriction upheld in *Overton* and that nothing in the record revealed the suspension to be imposed arbitrarily. *Id.* at 807–08. Thus, in both *Dunn* and *Williams*, qualified immunity barred any damages claims.

The uncertainty apparent in cases like *Wirsching*, *Dunn*, and *Ozmint* is fatal to Flynn's claims. *See White v. Pazin*, 1:12-cv-00917-BAM (PC), 2016 WL 6124234, at *7–8 (E.D. Cal. Oct. 19, 2016) (analyzing *Overton* and *Dunn* and finding that "[t]hese decisions do not contain any clear articulation of a constitutional right for prisoners to visitations from their children"). As

the district court explained in *White*, "[a]t best, *Overton* and [other decisions] sugges[t] that prisoners may enjoy some right to visitations from their children, and that a complete ban on visitations by minors may violate that right, but the question remains unsettled." *Id.* at *10. While this Court, like those before it, is cognizant of the significant toll a denial of familial contact may have on a prisoner, the law requires clear direction to prison officials that such conduct is proscribed before money damages may be had as a remedy. *White*, 137 S. Ct. at 551.

A decision of the Seventh Circuit issued just weeks ago confirms that the rights of prisoners *vis-á-vis* their family members have been in flux. In *Easterling*, a prisoner sued because he was denied visitation with his daughter for nearly fifteen years because of a twenty-year-old sexual assault conviction. *Easterling*, 2018 WL 298114, at *2. The appellate court did not reach the merits of his claims because, among other things, the prisoner had missed the statute of limitations. *Id.* at *3. But the Court of Appeals did make the following observation:

> Prisoners retain a limited constitutional right to intimate association, established by the Supreme Court in [*Turner*], and confirmed in [*Overton*]. *Turner* holds that limits on prisoners' rights are valid if "reasonably related to legitimate penological interests." 482 U.S. at 89, 107 S. Ct. 2254. *Overton* suggests that limits on family visits with a prisoner may violate that rule if "permanent or for a [long] period" or if "applied in an arbitrary manner." 539 U.S. at 137, 123 S. Ct. 2162. We therefore have said, albeit in a nonprecedential decision, that a prisoner—even a sex offender—who alleges that a permanent ban on visits with his minor children has no legitimate justification states a valid constitutional claim. See *Harris v. Donahue*, 175 F. App'x 746, 748 (7th Cir. 2006) (unpublished).

> Today, we confirm, this time in a published opinion, that prison officials may violate the Constitution by permanently or arbitrarily denying an inmate visits with family members in disregard of the factors described in *Turner* and *Overton*.

*Id.* at *2. In a footnote to the final sentence in this quotation, the Seventh Circuit noted that

> [i]n this respect, we join the weight of authority applying [*Overton*], and holding that, although inmates do not have an absolute right to visitation, prison officials may not restrict an inmate's visitation with family members without balancing the inmate's interests against legitimate penological objectives. *See, e.g., Dunn v. Castro*, 621 F.3d 1196, 1205 (9th Cir. 2010) (noting that "prisoners do not have an absolute right to visitation, [because] such privileges are necessarily subject to the prison authorities' discretion, provided their administrative decisions are tied to legitimate penological objectives" (emphasis added)); *Wirsching v. Colorado*, 360 F.3d 1191, 1201 (10th Cir. 2004) (upholding denial of visitation between incarcerated sex offender and his child after applying *Turner* factors).

*Id.* at *2 n.6.

*Easterling* represents a meaningful move toward defining a prisoner's right to visitation with family members. But for Flynn's case, the more salient aspect of *Easterling* is its observation that it is the first clear statement of that right by the Seventh Circuit in a published decision. Obviously, Burns cannot be held to the statements of our Court of Appeals, however clear, which emanate only after the challenged conduct. And though *Harris* applied *Turner* to a restriction on visitation between a prisoner and his minor children in 2006, as the *Easterling* panel noted, it is a non-precedential decision. *Harris*, 175 F. App'x at 748. Thus, whether from within this Circuit or without, Burns had no definitive rule in 2016 prohibiting him from issuing a no-contact order that banned all contact

between Flynn and his daughter for a one-year period based solely on a request from the mother.

It is also important to appreciate the as-applied nature of Flynn's challenge, which necessitates consideration of the fact that the no-contact order was in place for only one year. Such restrictions have been upheld even in cases involving parent-child or other close family relationships. In *Dunn*, the prohibition lasted eighteen months, and in *Overton* and *Williams* it was two years. *Dunn*, 621 F.3d at 1203; *Overton*, 539 U.S. at 134; *Williams*, 716 F.3d at 807. Furthermore, if the justification for issuing a no-contact order in this case was light—the word of one parent taken over another— or could have been more thoroughly investigated, it remains that Burns received information from which he could rationally conclude that contact with S.W. should be cut off. His mistake, if any, in that regard is not a basis for an award of money damages. *See Williams*, 716 F.3d at 807 (suspension not issued arbitrarily because prison officials concluded that prisoner had contraband).

Finally, as Burns points out, the no-contact policy has not been deemed unconstitutional in any judicial decision, at least none identified by either party. As noted in *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1251– 52 (10th Cir. 2003), "[i]n considering the 'objective legal reasonableness' of the state officer's actions, one relevant factor is whether the defendant relied on a state statute, regulation, or official policy that explicitly sanctioned the conduct in question." *See also Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994) ("Courts have [] held that the existence of a statute or ordinance authorizing particular conduct is a factor which militates in favor of the conclusion that a reasonable official would find that conduct constitutional."). That was the case here. While following the policy in place

does not absolve all constitutional violations, *Grossman*, 33 F.3d at 1209, in the absence of authority suggesting the policy was unconstitutional, the very existence of the policy weighs in favor of immunity, *Doe v. Heck*, 327 F.3d 492, 516 (7th Cir. 2003) (finding that although application of a state statute was unconstitutional as applied to the plaintiffs, it was not "so patently unconstitutional as to deny the defendants qualified immunity[.]").[13] Thus, Flynn's damages claims based on First Amendment and substantive due process violations must fall to Burns' assertion of qualified immunity.

### 3.4 Flynn's Procedural Due Process Claim

The same result obtains for Flynn's procedural due process claim because it is not clearly established that an inmate is entitled to any more procedure with respect to the no-contact order than what was provided. At the outset, it is worth observing that it is not apparent whether analysis of the no-contact policy in a procedural due process challenge is any different from the others, *see Bazzetta v. McGinnis*, 430 F.3d 795, 802–03 (6th Cir. 2005) (finding that *Overton* contained an "implicit holding" undermining procedural due process claims based on denial of visitation), but even if it is, Flynn's due process rights were likely satisfied. To succeed on a procedural due process claim, a prisoner has to prove: "(1) he has a liberty

---

[13]Burns raises a separate but related argument: that no claims can be maintained against him in his individual capacity because he was merely following the policy. (Docket #27 at 6–7). This defense is a variant of the oft-cited principle that "[p]ublic officials do not have a free-floating obligation to put things to rights, disregarding rules (such as time limits) along the way." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). Burns reasons that even if the warden or the DOC can be faulted for creating the policy, he had no power to do other than what he did. The Court's disposition of this case means that it need not and does not decide whether this argument has merit.

or property interest that the state has interfered with; and (2) the procedures he was afforded upon that deprivation were constitutionally deficient." *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007).

First, many courts have held that Flynn would not have a protectable liberty interest in this instance. Protected liberty interests are limited in prison context. Under *Sandin v. Conner*, 515 U.S. 472, 484 (1995), an inmate's liberty interests are protected by the Due Process Clause only insofar as a deprivation of the interest at issue would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

Relevant here, the Supreme Court has found that "[t]he denial of prisoner access to a particular visitor 'is well within the terms of confinement ordinarily contemplated by a prison sentence,' *Hewitt v. Helms*, 459 U.S. 460, 468 (1983), and therefore is not independently protected by the Due Process Clause." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 461 (1989). Additionally, several courts have held that restrictions on association with various non-incarcerated individuals did not implicate a protected liberty interest. *See Cherry v. McCaughtry*, 49 F. App'x 78, 2002 WL 31408905, at *1 (7th Cir. 2002) (inmate's temporary inability to visit his fiancée did not implicate a liberty interest); *Billups v. Galassi*, 202 F.3d 272, 2000 WL 6200, at *1 (7th Cir. 2000) (visiting privileges with girlfriend could be permanently revoked without a hearing "or any other due process protection"). It is unclear whether the Seventh Circuit or the Supreme Court would come to a different conclusion when an inmate's child is involved. *See Stojanovic v. Humphreys*, 309 F. App'x 48, 51 (7th Cir. 2009) (rejecting Eighth Amendment claim based on denial of visitation with daughter, citing *Thompson*). Other Circuit courts have not. *See Ware v. Morrison*, 276 F.3d 385, 388 (8th Cir.

2002); *Cleveland v. Martin*, 590 F. App'x 726, 732 (10th Cir. 2014); *Charriez v. Sec'y, Fla. Dep't of Corr.*, 596 F. App'x 890, 894 (11th Cir. 2015). Thus, procedural due process probably affords Flynn no relief because of the limitations on the types of interests that are protected.

Furthermore, Flynn received at least some process that appears to comport with constitutional standards. When an inmate's mail is restricted, the requirements for procedural due process are satisfied if the inmate receives notice of the restriction and has a reasonable opportunity to protest, and if the restriction is reviewed by a third party who did not participate in the original decision. *See Martinez*, 416 U.S. at 418–19. As before, the other effects of the no-contact policy are analyzed under a different standard, enunciated in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). There, the Supreme Court laid out three factors to determine the specific dictates of due process applicable to a case: (1) the private interest at stake; (2) the degree to which more process will make a difference in the risk of wrongful deprivation; and (3) the cost to the government of providing more procedural protection. *Id.*

Here, Flynn received notice of the no-contact order, had a reasonable opportunity to protest, and had the restriction reviewed by a third party. After receiving the initial notice, Flynn was permitted to file an inmate complaint challenging the decision, which he did. Muenchow investigated the complaint and recommended dismissing it, and the warden thereafter dismissed the complaint. The complaint was appealed unsuccessfully to the corrections complaint examiner. At this point, Flynn could have filed a certiorari lawsuit challenging the decision on his inmate complaint. *See McAtee v. Cowan*, 250 F.3d 506, 508 (7th Cir. 2001). He did not.

Flynn's exasperation with not being told about the availability of relief under the ICRS or in state court is immaterial. It might have been helpful for prison officials to apprise him of the avenues for potential relief, but Flynn cites no authority establishing that they must do so. What matters is that he was not denied the opportunity to challenge the no-contact order. Due process prohibits government interference in certain aspects of life; it does not impose an affirmative duty on the government to assist individuals in making their lives better. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). This is true even though Muenchow misspoke about the prison's authority to review the no-contact order. While this was an unfortunate and negligent misrepresentation, the Constitution has nothing to say about it. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998) ("The Constitution does not guarantee due care on the part of state officials[.]").

Ultimately, Flynn received the relief he sought by filing a second inmate complaint after obtaining a court order granting him permission to communicate with his daughter. After he filed the inmate complaint with this new order, the order was shown to Burns, and Burns told Flynn that same day that he could resume contact if he abided by the court's guidelines. As for Flynn's claim that Burns ignored the state court order, after construing the evidence in Flynn's favor, the worst that can be said is that Burns missed receipt of the order or forgot about it. This is negligence, which, again, the Constitution does not remedy. *Id.*

Considering the *Mathews* factors, first, as described above, it is unclear whether inmates have a constitutionally protected liberty interest attached to contacting their children. As for the second factor, more process at the outset might not have made a difference in light of the deference to

complainants which is inherent in the no-contact policy. Once a family court ordered that communication be permitted, the no-contact order was lifted. Finally, the cost to the government of providing more protection weighs heavily against requiring additional procedures. There are approximately 165 no-contact orders in place at Waupun. Staff do not have the time, resources, or training to conduct an antecedent adjudication of each request for such an order.

In sum, then, it appears Flynn received whatever process he may have been due. At a minimum, the important questions surrounding what liberty interest is at stake, its strength, and whether the procedures afforded were adequate, all lead to the conclusion that a reasonable official in Burns' place would not have known he was violating the law. As a result, the Court must dismiss all claims for money damages on the basis of qualified immunity. *White*, 137 S. Ct. at 551.

### 3.5    The Official Capacity Claim is Moot

This leaves only Flynn's official-capacity claim against Burns for declaratory and injunctive relief. After Flynn filed a motion to amend his complaint, the Court allowed him to proceed on an official-capacity claim against Burns to enjoin the application of the no-contact policy to him. (Docket #17 at 5). That claim is now moot because the no-contact order is no longer in place, having been lifted on June 15, 2017. Flynn is free to contact his daughter according to the conditions enumerated in the state court order.

Flynn suggests that the case is not moot because the prison could re-instate the no-contact restriction. But this speculative fear is not enough to warrant injunctive relief from a federal court. Implicit in the "case-or-controversy" requirement of Article III is the principle that "federal courts

may not give opinions upon moot questions or abstract propositions."
*Worldwide St. Preachers' Fellowship v. Peterson*, 388 F.3d 555, 558 (7th Cir.
2004) (internal quotations omitted). While voluntary cessation of illegal
activity does not necessarily render a case moot, *United States v. W.T. Grant
Co.*, 345 U.S. 629, 632 (1953), "the moving party must still satisfy the court
that injunctive relief is required," *Milwaukee Police Ass'n v. Jones*, 192 F.3d
742, 748 (7th Cir. 1999). "'The necessary determination is that there exists
some cognizable danger of recurrent violation, something more than the
mere possibility which serves to keep the case alive.'" *Id.* (quoting *W.T.
Grant*, 345 U.S. at 633). The mere "theoretical possibility" of a repeat
violation is not enough. *Walsh v. United States Dep't of Veterans Affairs*, 400
F.3d 535, 537 (7th Cir. 2005).

In this case, Flynn is presently under no restriction on contact with
his daughter other than that specified in the state court's order, the terms of
which he does not challenge. Other than a generalized worry that the prison
will flout the state court order, Flynn offers no reason to believe that
injunctive relief is necessary or appropriate to guard against future
unjustified no-contact orders.

Indeed, for this Court to enjoin any future no-contact orders may do
more harm than good, as it might interfere with the DOC's application of
its policies on the mere surmise that a future no-contact order would be
unwarranted. Justifications for injunctions must always be strong, but even
more so in the prison context, where 18 U.S.C. § 3626 requires that any
prospective relief must be "narrowly drawn, exten[d] no further than
necessary to correct the violation of the Federal right, and [be] the least
intrusive means necessary to correct the violation of the Federal right." 18
U.S.C. § 3626(a). Further, "[t]he court shall give substantial weight to any

adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.* Thus, Congress has more closely circumscribed in prisoner cases the already limited availability of injunctive relief. *Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012) ("The Prison Litigation Reform Act circumscribes the scope of the court's authority to enter an injunction in the corrections context. . .[to] enforce[e] a point repeatedly made by the Supreme Court in cases challenging prison conditions: '[P]rison officials have broad administrative and discretionary authority over the institutions they manage.'") (quoting *Hewitt*, 459 U.S. at 467).

Because of this, the Court declines to issue any such relief in this case. If a future no-contact order arises, the justification for it can be addressed after a full development of the pertinent facts. However, for the present, there is no "effectual relief whatever" that this Court can order, therefore no declaration or injunction can issue, and the case must be dismissed. *See Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (citation omitted); *Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977) (a request for declaratory relief, standing alone, does not save an otherwise moot case).

**4.     CONCLUSION**

Viewing the record evidence in the light most favorable to Flynn, the Court is constrained to grant summary judgment to Burns on all of Flynn's claims. As a result, this case will be dismissed.

Accordingly,

**IT IS ORDERED** that Defendant's motion for summary judgment (Docket #26) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion for summary judgment (Docket #38) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion to seal certain exhibits to his summary judgment submissions (Docket #40) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 29th day of January, 2018.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Court